JOHN JONES vs. CINCINNATI, INC.

No. 90-P-384.

Norfolk. October 22, 1991. - April 2, 1992.

Present: SMITH, JACOBS, & GILLERMAN, JJ.

*Negligence*, Manufacturer, Press brake, Design, Proximate cause. *Evidence*, Income from collateral source.

At the trial of an action by a worker injured while operating an industrial machine against the manufacturer of the machine, which proceeded on theories of negligent design and breach of warranty, the judge correctly ruled that the question whether the conduct of the plaintiff's employer constituted a superseding cause of his injury was for the jury to decide. [369-371]
A Federal regulation promulgated under the Occupational Safety and Health Act of 1970 (OSHA), providing that "[t]he point of operation of machines whose operation exposes an employee to injury, shall be guarded" by the employer, introduced in evidence at the trial of a worker's personal injury action against the manufacturer of an industrial machine, did not establish a superseding cause that would free the manufacturer from liability. [371-372]
At the trial of a worker's personal injury action against the manufacturer of an industrial machine, proffered evidence of the plaintiff's post-accident collateral source income was properly excluded. [372-373]

CIVIL ACTION commenced in the Superior Court Department on October 12, 1984.

The case was tried before *Suzanne V. DelVecchio*, J.

*Thomas D. Burns* (*John J. McGivney* with him) for the defendant.

*Paul F. Leavis* for the plaintiff.

SMITH, J. On April 13, 1984, the plaintiff, John Jones, was injured while operating a machine designed and manufactured by the defendant, Cincinnati, Inc. (Cincinnati). The plaintiff brought an action in the Superior Court against Cincinnati on theories of negligent design and breach of warranty. Cincinnati denied liability, and the case proceeded to

trial before a jury. At the close of the plaintiff's evidence and again at the close of all the evidence, Cincinnati moved for a directed verdict. See Mass.R.Civ.P. 50(a), 365 Mass. 814 (1974). The judge denied the motions. The jury found Cincinnati to have been 56% negligent, the plaintiff to have been 44% contributorily negligent, and both parties' negligence to have proximately caused the plaintiff's injuries. The jury also found that Cincinnati had breached the implied warranty of merchantability and, as a result, had proximately caused the plaintiff's injuries. The jury awarded the plaintiff the sum of $500,000 for his injuries. After the verdict, Cincinnati moved for judgment notwithstanding the verdict or for a new trial. See Mass.R.Civ.P. 50(b), 365 Mass. 814 (1974). The motion was denied.

On appeal, Cincinnati claims that the judge committed error in denying the motions for directed verdict and judgment notwithstanding the verdict. It also contends that the judge erred when she excluded evidence of the plaintiff's collateral source income, offered by Cincinnati, to impeach the plaintiff's credibility.

1. *Denial of Cincinnati's motions for directed verdict and judgment notwithstanding the verdicts.* At trial, Cincinnati argued that its motions for directed verdict should have been allowed because the conduct of the plaintiff's employer, General Dynamics Shipyard (General Dynamics), constituted a superseding cause of the plaintiff's accident, as matter of law.[1] The judge denied the motions, ruling that the question of superseding cause was for the jury to decide.[2]

We summarize the evidence that is relevant to our analysis of the issue raised by Cincinnati, viewing that evidence in the

---

[1] "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 440 (1965).

[2] In her instructions to the jury on superseding cause, the judge stated that if they "found that the conduct of someone other than Cincinnati . . . [w]as the sole proximate cause of [the plaintiff's] accident, then [they] must return a verdict for [Cincinnati] on both the negligence and warranty counts." Cincinnati concedes that the wording of the instruction was correct.

light most favorable to the plaintiff. *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326-327 (1982). On the day of the accident, the plaintiff was operating a press brake, a "multi-purpose" machine used in the bending and forming of materials. The principal moving part of the machine was a "ram" that moved three inches downward, with a maximum force of 225 tons, and then up again. Below the ram was a stationary "bed" that, depending upon the adjustment of the ram, was fixed between seven and twelve inches beneath the ram. The stroke of the ram was controlled by a foot-activated switch approximately two inches from the floor and centered in front of the machine. The foot switch was covered by a "hood" or "dome" that prevented activation by falling objects but was open on one end to permit the insertion of the operator's foot. Just as the descent of the ram could be started by depressing the foot switch, it could be stopped by the operator taking his foot off the pedal.

Cincinnati designed the press brake so that the ram and bed accommodated various dies used in bending and forming operations. The dies were inserted by the operator into the ram and the stationary bed. The material to be formed by the dies was placed by hand into the space between the dies. That space is known as the "point of operation." After the material was formed to the required shape by the descending ram, it was removed by hand from the point of operation. Cincinnati knew that an operator would use his hands to insert and remove materials from the point of operation. It was also aware of the likelihood that operators would perform the tasks of inserting and removing material from the point of operation while the machine was running.[3]

The press brake that the plaintiff was operating at the time of his injury was manufactured by Cincinnati in 1966. At that time, no industry standards or government regulations existed in regard to the safety features of a press brake. The press brake that Cincinnati sold to General Dynamics

---

[3]The press brake is running, but not cycling, when the motor on top of the press brake is operating but the ram is not moving downward. When the ram is in downward motion, the press brake is considered in "cycle."

did not have any safeguards to protect an operator from injury at the point of operation. Cincinnati had available, however, design modifications and safety devices, including press brakes with dual palm buttons, which would have prevented the press brake from cycling while an operator's hands were in the point of operation. A press brake with dual palm buttons requires that the operator place his hands on both buttons in order to activate the machine; an operator's hands cannot be in the point of operation while the machine cycles because, once the operator removes his hands from either of the buttons, the ram stops.

Additionally, Cincinnati had available to it press brakes with alternative control devices: dual palm buttons as well as a foot switch. Those press brakes had a selecting dial that would allow the operator to use either the dual palm buttons or the foot switch, depending on the particular task to be performed. These safety devices were not provided by Cincinnati as standard equipment on the press brake that injured the plaintiff. In 1973, Cincinnati did provide, as standard equipment, press brakes that included dual palm buttons, a foot switch, and a selecting dial.

The plaintiff was injured while engaged in a "hemming" operation. "Hemming" is a two-stage operation requiring two sets of dies. In the first stage, the material is bent into a V shape; in the second stage, the material is flattened. The plaintiff cycled the press brake using the foot switch. The ram came down, formed a V in the material, and returned, completing one cycle. The material, however, stuck to the top die.[4] The plaintiff reached in and unsuccessfully tried to snap the piece off. At this point, the press brake was running but not cycling. As the plaintiff moved for firmer footing, he inadvertently hit the foot pedal causing the press brake to cycle, crushing his hands between the dies.

---

[4]There was evidence that it was not uncommon to have part of the material stick to the top die during a "hemming" operation. When this occurred, the operator would place his hands up underneath the top die, curl his hands around the far side of the die, and try to snap the piece free. Usually, this method was successful.

Cincinnati focuses on the following undisputed evidence to support its claim that the negligence of General Dynamics constituted a superseding cause of the plaintiff's accident as matter of law. In 1976, some ten years after the press brake was sold to General Dynamics, Cincinnati sent General Dynamics information regarding the availability of dual palm buttons and photo electric presence-sensing devices for installation on its machines. It also sent pressure-sensitive warnings alerting operators, "Never place your hands within point of operation." Similar literature was sent to General Dynamics by Cincinnati again in October, 1978, April, 1979, and February, 1980. General Dynamics never responded to the letters and did not install any of the recommended safety devices.

Cincinnati also argues that an Occupational Safety and Health Act (OSHA) regulation that was in evidence established a superseding cause. That regulation, 29 C.F.R. § 1910.212(a)(3) (1991), states, in pertinent part, that "[t]he point of operation of machines whose operation exposes an employee to injury, shall be guarded" by the *employer.*

We now turn to our analysis of the issue raised by Cincinnati. The evidence in this case warranted findings that Cincinnati negligently designed the press brake and also breached its implied warranty of merchantability. See *Fahey* v. *Rockwell Graphic Sys., Inc.,* 20 Mass. App. Ct. 642, 647-652 (1985), for a thorough analysis of the evidence needed to support both theories. Cincinnati does not argue otherwise. Rather, it claims that the negligence of General Dynamics was so pervasive that it constituted a superseding cause of the plaintiff's accident as matter of law. We disagree.

a. *General Dynamics' conduct.* Generally, a tortfeasor is liable "for the foreseeable intervening conduct of a third party whether that conduct is negligent or not." *Correia* v. *Firestone Tire & Rubber Co.,* 388 Mass. 342, 352 n.10 (1983), quoting from *Wilborg* v. *Denzell,* 359 Mass. 279, 285 (1971). Therefore, the question whether the conduct of General Dynamics constituted a superseding cause of the plaintiff's accident is not resolved by showing merely that the

conduct was negligent. The issue of superseding cause is re-solved "not in the number of intervening events or agents, but in their character, and in the natural and probable connection between the wrong done and the injurious consequence." *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 795-796 (1987), quoting from *McDonald* v. *Snelling*, 14 Allen 290, 296 (1867). Further, "only unusual, extraordinary negligence of a third party will excuse an original tortfeasor's liability." *A. L.* v. *Commonwealth*, 402 Mass. 234, 244 (1988).

Here, the conduct of General Dynamics did not as matter of law constitute a superseding cause of the plaintiff's accident. Cincinnati knew or should have known when it manufactured the product that an operator would place his hands into the point of operation while using the machine. "[A] manufacturer must anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Back* v. *Wickes Corp.*, 375 Mass. 633, 640-641 (1978). Cincinnati, however, sold the press brake without safeguards at the point of operation even though such safeguards were available.

When it sold the press brake to General Dynamics, Cincinnati impliedly warranted that the press brake was "fit for the ordinary purposes for which such [press brakes] are used . . . [including] both those uses which [they] intended and those which are reasonably foreseeable." *Fahey* v. *Rockwell Graphic Sys., Inc.*, 20 Mass. App. Ct. at 651, quoting from *Back* v. *Wickes Corp.*, 375 Mass. at 640. The press brake was operated by the plaintiff as Cincinnati had intended it would be used. General Dynamics had not modified or altered the press brake in any way.[5] Thus, General Dynamics'

---

[5]Cincinnati claims that it did not design the point of operation but rather designed "a tool" to be used by General Dynamics. It argues that General Dynamics altered the machine by using different dies for each operation. That argument is without merit.

There was evidence that the press brake was designed and intended by Cincinnati to be used with dies. Further, it was clearly intended by Cincinnati that, as designed and manufactured, the press brake would have a

use of the press brake, "as it was intended and without any alterations to the [press brake], is a foreseeable use." *Solimene* v. *B. Grauel & Co., KG, supra* at 796.

We recognize that some factors might support a finding that General Dynamics' negligence had superseded that of Cincinnati at the time of the plaintiff's accident. They include the lapse of time between the sale of the press brake to General Dynamics and the accident, the failure of General Dynamics to install safety devices, and its failure to post warning labels after being warned of the dangers by Cincinnati.[6] Such conduct, however, does not in the circumstances rise to the level of such extraordinary, unforeseeable conduct that is required to relieve Cincinnati of its liability as matter of law — especially in view of Cincinnati's failure to design a safe product. *Solimene* v. *B. Grauel & Co., KG, supra* ("the designer of the product [is] in the best position to recognize and eliminate design defects"). We therefore hold that the judge did not commit error when she left it to the jury to decide whether the conduct of General Dynamics constituted a superseding cause. *Id.* at 794 ("Generally, questions of causation, proximate and intervening, present issues for the jury to decide"). See also Restatement (Second) of Torts § 453 (1965).

b. *OSHA regulation.* Cincinnati's argument that the OSHA regulation, by itself, constituted a superseding cause is without merit. OSHA was enacted in 1970 for the express purpose of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, 84 Stat. 1590 (1970). OSHA expressly

---

point of operation within a defined area of the machine. The adding of dies to the press brake to perform a particular task did not constitute an alteration of the machine in the circumstances of this case.

[6]Cincinnati also claims that General Dynamics was negligent in failing to instruct the plaintiff in the proper and safe operation of the press brake and in failing to warn him of dangers not reasonably obvious to him. Taking the evidence most favorable to the plaintiff's cause of action, as we must, it demonstrates that he was properly instructed in the use of the machine by General Dynamics and also was made aware of the dangers associated with the operation of the machine.

states that it does not intend to enlarge or diminish the common law rights of employers or employees. Further, "[w]e are aware of no case which holds that OSHA preempts state tort law." *Pedraza* v. *Shell Oil Co.*, 942 F.2d 48, 52 (1st Cir. 1991). To adopt Cincinnati's interpretation of OSHA would permit manufacturers who negligently design or sell defective and dangerous machines to be free from all liability. Such an interpretation conflicts with our law and is unwarranted.

2. *Admissibility of collateral source income.* Cincinnati claims that the judge committed error when she excluded evidence that the plaintiff's post-accident collateral source income was twice his pre-accident income. The purpose of the offered evidence was to impeach the plaintiff's credibility regarding statements that he was unemployable due to his injuries, bored from staying home, and under stress because of the appearance that his wife had to work to support him.

Cincinnati does not dispute that the plaintiff's post-accident income was attributable to workers' compensation and Social Security benefits. It also acknowledges that, generally, "a defendant may not show that the plaintiff has received other compensation for his injury, whether from an accident insurance policy, from workmen's compensation, from an employer, or from other sources" (citations omitted). *Goldstein* v. *Gontarz*, 364 Mass. 800, 808-809 (1974).

In *Corsetti* v. *Stone Co.*, 396 Mass. 1, 16-21 (1985), the court crafted a narrow exception to the general rule, stating that the evidence was admissible in that case because it was relevant on the question of malingering and because the plaintiff "ha[d] volunteered testimony as to penurious circumstances allegedly resulting from his injury." *Id.* at 20.

As the trial judge recognized, that simply is not the case here. The plaintiff did not claim poverty by testifying that he was financially disadvantaged as a result of his injuries, and there was ample evidence of the plaintiff's work history and relatively low pre-accident income. A review of the record demonstrates that the judge did not abuse her discretion in

refusing to allow the admission of the evidence of collateral source income.

*Judgment affirmed.*